[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14211

_____

ADAM U. STEINES,
Individually, and on behalf of all others similarly situated,
MIRANDA L. STEINES,
Individually, and on behalf of all others similarly situated,
ANDREW M. ORMESHER,
Individually and on behalf of all others similarly situated,

                                        Plaintiffs-Appellees,

*versus*

WESTGATE PALACE, L.L.C.,
a Florida limited liability company,
WESTGATE RESORTS, INC.,
a Florida corporation,
WESTGATE RESORTS, LTD., LP,
a Florida limited partnership,
CENTRAL FLORIDA INVESTMENTS, INC.,

2                    Opinion of the Court                    22-14211

WESTGATE VACATION VILLAS, LLC,
CFI RESORTS MANAGEMENT, INC.,

                                                    Defendants-Appellants,

WESTGATE LAKES, LLC.,

                                                    Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cv-00629-RBD-DAB

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

    Adam and Miranda Steines (together, the "Steines"[1]) pur-
chased a timeshare in an Orlando resort hotel from Westgate.
Adam Steines was (and is) an active-duty servicemember in the
United States Army.  To finance the timeshare, the Steines took out
a loan from Westgate.  The Steines agreed to arbitrate all issues

_____

[1] We adopt the convention of the parties and the district court of pluralizing
the Steines' last name this way.

arising from the contract -- including the enforceability of the arbitration agreement itself, which the contract calls a "delegation clause."

In February 2022, the Steines brought this class action against Westgate in the Middle District of Florida, alleging that Westgate extended consumer credit to them in violation of the Military Lending Act, 10 U.S.C § 987 (the "MLA"). Westgate promptly moved the district court to compel arbitration pursuant to the agreed-upon delegation clause and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), and to dismiss the complaint, asserting that the MLA does not apply to a loan designed to finance a timeshare. The Steines responded, however, that the MLA completely overrides the application of the FAA in this case and prohibits enforcement of the arbitration clauses. After conducting an evidentiary hearing, the district court denied Westgate's motions to compel arbitration and to dismiss the complaint.

Westgate appealed to this Court. We face three issues today. First, Westgate says that the district court should not have addressed the question of whether the MLA overrides the FAA because that matter was a question of arbitrability that was delegated by agreement of the parties to the arbitrator to decide. But Westgate is wrong: the question of whether the FAA has been overridden by another congressional enactment necessarily precedes the court's enforcement of any arbitration agreement, including a delegation clause, and always belongs to the court. Second, Westgate argues that, even if the district court may properly decide the issue,

the MLA does not override the FAA, at least as to the parties' delegation clause. But the text of the MLA unambiguously establishes Congress's intent to override the FAA and make unlawful *any* agreement to arbitrate, including the delegation clause. Finally, we agree with the district court that the MLA applies in this case because the timeshares are more like transient lodgings -- like hotel rooms -- than dwellings, and thus do not fall into the MLA's exception for "residential mortgages."

We agree with the district court that the FAA does not apply, leaving this Court without any jurisdiction to entertain this interlocutory appeal, and accordingly we dismiss.

## I.

Westgate is a resort company that sells timeshare interests. Westgate is also a lender and creditor. In essence, Westgate sells customers timeshares at its vacation resorts, and then loans those customers the money to pay for the timeshares.

In August 2019, Adam Steines -- an active-duty soldier in the United States Army -- and his spouse, Miranda Steines, were approached outside of a restaurant in Williamsburg, Virginia, by a Westgate sales representative. The Westgate representative offered the Steines a $175 Visa gift card in exchange for sitting through a sales presentation. The Steines accepted. After a five-hour-long, high-pressure sales presentation, the Steines purchased a "timeshare interest[] in the Time Share Accommodations known as WESTGATE PALACE, a TimeShare Resort," located in Orlando, Florida.

Upon execution of the Purchase and Sale Agreement, Westgate conveyed to the Steines a deed.  Specifically, the deed stated that the Steines received:

> 1/2 Time Share Interest(s) All Season -- Float Week / Float Unit according to the Time Sharing Plan for Westgate Palace, a Timeshare Resort . . . .  Together with the right to occupy, pursuant to the Plan, Building(s) / Unit(s) / Unit Week(s) / Assigned Year(s), 1/1912 / 22 / ODD.

This deed contains several components that require some explanation in order to understand what the Steines actually bought.  First, the deed conveyed a "Time Share Interest."  The Declaration of Covenants, Conditions and Restrictions for Westgate Palace -- referred to as the "Plan" -- defines a "Timeshare Interest" as

> the Ownership in fee simple of an undivided interest as a tenant in common with the other Owners in a particular building in the Resort Facility, one Timeshare Interest being a fraction, the numerator of which is one (1) and the denominator of which is the number of Units in the building multiplied by fifty-two (52).

This definition is consistent with the purchase and sale agreement. The Plan further clarifies that the timeshare interest "shall be limited to an undivided interest only in the building in which the Assigned Unit and Assigned Unit Week is located."  Specifically, the

building that the Steines have a timeshare interest in is an eighteen-story tower with over 200 units.

Second, the deed describes the Steines as receiving a 1/2 Time Share Interest.  The Plan explains that this means that the interest is limited to only one week every other year -- for the Steines, odd years.

Third, although the deed states that the Steines have the "right to occupy" Unit 1-1912 on their assigned weeks and years, the deed also says that this is a "Float Week / Float Unit according to the Time Sharing Plan."  The Plan clarifies that

> owners of Floating Unit Weeks shall not be entitled to possession and use of the specific Unit or the specific Unit Week assigned, but instead, such possession and use rights are released in consideration for receiving the right to request a reservation . . . for a Floating Unit Week within the Floating Use Plan system.

The Floating Use Plan essentially entitles the owner of a floating unit week to make a reservation for a week at the resort, in whatever room the resort has available at the time, if any.

Put simply, the Steines have been assigned a unit in the building, and possess a fee simple interest as a tenant in common in the building that unit is in.  They do not have the right to occupy that specific unit or any other specific unit; rather they have bought the right to stay in *a* unit in the building for one week every other year, but only if one is available when they make a reservation. The Steines have never gotten the chance to use the resort.

To finance this purchase, the Steines took out a loan from Westgate for $8,024.87, subject to a 17.99% Annual Percentage Rate. The Steines claim that this number actually rises to a 19.124% Military Annual Percentage Rate once everything calculated in that number is included, but this higher number was not included in the Note. When all is said and done, the Steines are required to pay Westgate a little more than $18,000 over ten years. In addition, the Steines are required to pay approximately $750 in fees every odd year for the duration of the timeshare, along with any special assessments the Westgate Palace Owner's Association may levy. The Steines also pay approximately $90 in ad valorem property taxes every odd year. Finally, the Steines executed a mortgage; the timeshare interest served as mortgage collateral.

As part of the purchase agreement, the parties also executed an arbitration agreement, under which the Steines agreed to arbitrate "any claim, dispute, suit, demand, cross claim, counterclaim, or third party complaint (whether statutory, in tort, or otherwise) arising out of or relating to" the timeshare agreement. The agreement also included a delegation clause: the parties agreed to arbitrate "the validity, scope or applicability of this provision to arbitrate."

On February 2, 2022, the Steines filed a class action suit against Westgate[2] in the United States District Court for the Middle

---

[2] We refer to the defendant corporate entities in this case -- Westgate Palace, LLC; Westgate Resorts, Inc.; Westgate Resorts, LTD, LP; Central Florida

District of Florida, alleging violations of the MLA, including that the company's loan documents do not provide a servicemember the true interest rate on the loan, that Westgate failed to provide written or oral disclosures, which the statute requires in order to ensure that servicemembers understand the cost of the debt they assume, and that Westgate unlawfully included a mandatory arbitration clause, despite the statute's prohibition from doing so. The Steines seek rescission of their timeshare along with injunctive relief, damages, and restitution. They also seek to represent a class of similarly situated servicemembers and their families covered by the MLA.

Westgate moved the court to compel arbitration and dismiss the complaint. The district court held an evidentiary hearing on October 11, 2022, to determine whether the timeshare property the Steines bought was really a "residential structure" for the purposes of the MLA. The parties were directed to produce "any . . . evidence they consider[ed] relevant to the analysis." The district court admitted all exhibits submitted by Westgate and also took testimony from its chief business officer.

On December 14, 2022, the district court issued an order denying the motions to compel arbitration and to dismiss the complaint.

This timely appeal ensued.

---

Investments, Inc.; Westgate Vacation Villas, LLC; and CFI Resorts Management, Inc. -- collectively as "Westgate."

## II.

We review the district court's denial of a motion to compel arbitration *de novo*. *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1344 (11th Cir. 2021). Issues of statutory interpretation are also reviewed *de novo*. *United States v. Pendergrass*, 995 F.3d 858, 871 (11th Cir. 2021). Of course, we accept all findings of fact made by the district court that are not clearly erroneous. *Hamrick*, 1 F.4th at 1344.

## A.

The first question is who gets to decide the threshold issue of arbitrability -- the court or the arbitrator. Westgate says that the delegation clause the Steines agreed to is the beginning and end of this question. Because the delegation clause is a severable contract that sends the question of the validity and enforceability of the arbitration agreement to the arbitrator, Westgate reasons, the FAA limited the district court's role solely to referring the matter to arbitration. But the Steines challenged the enforceability of the arbitration agreement on the premise that the MLA renders the FAA inapplicable in the first place. The district court declined to refer the case to the arbitrator without first determining whether the MLA overrode the FAA. The district court was correct to do so.

As a matter of general contract law, parties can agree to arbitrate disputes. *See Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1191 (2024). The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable." *See* 9 U.S.C. § 2. Moreover, "[u]nder the FAA, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Attix v. Carrington*

*Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

Additionally, the FAA permits parties -- as they did here -- to enter a separate agreement to "arbitrate threshold arbitrability issues" known as a "delegation agreement" or a "delegation clause." *Id.* at 1295. In this circumstance, the FAA limits the district court's role to determining whether the delegation agreement itself -- as a standalone contract -- is enforceable. *See id.* at 1295–96; *see also Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015) ("[W]here an arbitration agreement contains a delegation provision . . . the courts only retain jurisdiction to review a challenge to that specific provision."). This is because § 2 of the FAA mandates that arbitration provisions -- including delegation clauses -- are severable from any larger contract of which they are a part. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 447 (2006). In other words, if § 2 of the FAA applies, the district court must enforce the delegation clause as a separate contract unless the delegation clause itself is specifically invalidated, even if the underlying contract or arbitration agreement is clearly invalid. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019).

But these rules would apply only if the FAA does. In the absence of the statutory authority found in the FAA, the district court would lack the power to stay the litigation in its own court and compel arbitration. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019) ("The parties' private agreement may be crystal clear and

require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum."). Thus, the district court has no power to stay the litigation and compel arbitration where Congress has specifically overridden the FAA, *see Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987), or where the arbitration agreement falls into one of the FAA's exclusions, *see New Prime Inc.*, 586 U.S. at 111. As the Supreme Court explained in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987), "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command." *Id.* at 226. If a challenge is made to the applicability of the FAA itself, the district court must determine whether the FAA has been overridden by an act of Congress before it may enforce an arbitration agreement. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (holding that a court must consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims" prior to enforcing an arbitration clause).

Nothing found in a delegation clause alters that obligation. After all, "[a] delegation clause is merely a specialized type of arbitration agreement." *New Prime Inc.*, 586 U.S. at 112. If the FAA has been overridden by a congressional command found in another statute, as is the case here, the district court cannot enforce the delegation clause any more than it could enforce any other arbitration agreement. Where the challenger attacks the applicability of the FAA's statutory scheme as a whole, the challenge necessarily raises an "antecedent statutory inquiry" that the court must resolve. *Id.*

Before the court could invoke the FAA's severability principle or, indeed, the FAA at all, it must determine if the contract in question even falls within the scope of the FAA. *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)).

Put simply, the question of whether the FAA has been overridden by another act of Congress cannot be delegated to an arbitrator. Inasmuch as the Steines argue that the MLA has completely overridden the FAA, the district court was right to answer that question first.

**B.**

We come, then, to the basic question: has the MLA overridden the FAA? The answer, again, is yes. The statutory text of the MLA couldn't be clearer that where the MLA applies, the FAA does not. The MLA acts as a "legal constraint[] external to the parties' agreement" that forecloses enforcement of arbitration, including the enforcement of a delegation clause. *See Mitsubishi Motors Corp.*, 473 U.S. at 628.

We begin with the principle that, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Because the Steines allege that the MLA "cannot be harmonized" with the FAA, they bear a "heavy burden." *Id.* To meet their burden, the Steines must establish nothing less than a "clearly expressed congressional intention" that the

MLA supersede the FAA, and that intention "must be clear and manifest." *Morton*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)); *see also Epic Sys. Corp.*, 584 U.S. at 510. We approach the claimed conflict with a strong presumption that if Congress intended to override preexisting law, Congress would have specifically addressed the matter. *Epic Sys. Corp.*, 584 U.S. at 510.

The Steines have made the requisite showing. Two separate clauses of the MLA establish Congress's clear intent to prohibit lenders of consumer credit from requiring servicemembers to arbitrate claims arising therefrom. The MLA entirely displaces the FAA.

Congress passed the MLA following a 2006 report from the Department of Defense that found that high interest loans targeting active-duty servicemembers were "a source of considerable collateral damage" for the military and its servicemembers, including difficulty maintaining security clearances and "personal readiness." U.S. Dep't of Def., *Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* at 39 (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [https://perma.cc/NAC5-D97H] ("*Dep't of Def. Report*"). Consequently, the MLA provides servicemembers and their families additional protection when obtaining consumer credit. *See generally* 10 U.S.C § 987. Among these protections -- and at the specific urging of the Department of Defense, *see Dep't of Def. Report* at 7–8 -- the MLA prohibits loan contracts to servicemembers from

including mandatory arbitration clauses. The MLA accomplishes this goal in two ways.

First, § 987(e)(3) of the MLA unambiguously states that it "shall be unlawful for any creditor to extend consumer credit" to a servicemember where "the creditor requires the borrower to submit to arbitration." 10 U.S.C. § 987(e)(3). This is a clearly expressed intention to supersede the FAA, and thus render any mandatory arbitration agreement nugatory. The Supreme Court has previously recognized this displacement in *Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018). There, the Court held that the National Labor Relations Act did not manifest a congressional intention to displace the FAA. *Id.* at 511. By contrast, the Court explained:

> Congress has . . . shown that it knows how to override the Arbitration Act when it wishes -- by explaining, for example, that, "notwithstanding any other provision of law, arbitration may be used only if" certain conditions are met, 15 U.S.C. § 1226(a)(2); or that "no predispute arbitration agreement shall be valid or enforceable" in other circumstances, 7 U.S.C. § 26(n)(2); 12 U.S.C. § 5567(d)(2); *or that requiring a party to arbitrate is "unlawful" in other circumstances yet, 10 U.S.C. § 987(e)(3).*

*Id.* at 514 (alterations adopted) (emphasis added). In other words, the Supreme Court has recognized, albeit in dicta, that the MLA overrode the FAA by making it "unlawful" to require a party subject to the MLA to arbitrate.

Second, the language of the MLA goes further and makes the point even clearer. The statute explicitly overrides § 2 of the FAA. Section 987(f)(4) of the MLA says that, "[n]otwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4). If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute. The district court properly concluded that the MLA overrode the FAA for all disputes, including those involving the arbitrability question itself. Because the FAA has been unmistakably overridden, both the delegation clause and the underlying arbitration agreement at issue in this case are unenforceable.

Westgate's arguments to the contrary are unconvincing. In essence, Westgate says that the Steines' reliance on the MLA is not a specific challenge to the enforceability of the delegation agreement, because the MLA only forbids agreements to arbitrate disputes "involving the extension of consumer credit." But, Westgate continues, the FAA's severability principle means that this Court must consider the delegation clause as a standalone contract, independent of the underlying agreements to arbitrate or extend consumer credit. Because the delegation clause only concerns arbitration involving issues of arbitrability -- not the extension of consumer credit -- Westgate reasons, the MLA cannot challenge the delegation clause as a severable contract.

Westgate's argument fails. The Supreme Court has been clear that the severability principle upon which Westgate relies would apply only if the underlying contract falls within the scope of §§ 1 and 2 of the FAA. *See, e.g., New Prime Inc.*, 586 U.S. at 112 ("[T]he [FAA's] severability principle applies only if the parties' arbitration agreement appears in a contract that falls within the field §§ 1 and 2 describe."); *Rent-A-Ctr.*, 561 U.S. at 70–71 (attributing the severability principle to § 2 of the FAA). If the FAA has been overridden -- and it has -- then Westgate's entire argument relying on the FAA's statutory framework goes with it.

Westgate also compares the instant case to our recent decision in *Attix v. Carrington Mortgage Services, LLC*, 35 F.4th 1284 (11th Cir. 2022). But that case is readily distinguishable. In *Attix*, our Court held that the Dodd-Frank Act, which provided that a mortgage-related contract could not "bar a consumer from bringing an action in an appropriate district court of the United States," did not affect the enforceability of a delegation agreement. *Id.* at 1307 (quoting 15 U.S.C. § 1639c(e)(3)). Explaining why this was the case, the panel emphasized that nothing about delegating threshold issues barred consumers from bringing an action in federal district court because the only delegated issue was the threshold one, after which the arbitrator would refer the issue back to the federal court. *See id.* The statute before us today is altogether different. Unlike the Dodd-Frank Act, the MLA does not merely prohibit agreements that prevent consumers from bringing an action in federal court, but rather displaces the FAA altogether. 10 U.S.C. § 987(e)(3), (f)(4).

Since the MLA plainly overrides the FAA, the delegation clause cannot be enforced.

## III.

Westgate's final argument is that, even if the MLA does override the FAA, the MLA doesn't apply in *this* case because Westgate's extension of "consumer credit" to the Steines fell into the MLA's exception for a "residential mortgage."[3]   10 U.S.C. § 987(i)(6).   After conducting an evidentiary hearing, the district court found that the timeshare loan was not a residential mortgage.[4]  Once again, we agree.

We start with the text of the MLA.  The MLA tasks the Secretary of Defense with prescribing regulations to carry out the statute, including defining the terms found in § 987(i)(6) of the MLA.

---

[3] All of the parties agree that the timeshare loan falls into the category of "consumer credit" generally.

[4] Westgate also argues that the district court could not procedurally address whether the MLA applies at this stage because whether the MLA applies is also a core merits issue in the lawsuit.  Westgate says that core merits issues cannot be decided on a motion to compel arbitration.  This argument is a nonstarter. A court cannot avoid determining the validity of an arbitration agreement just because that inquiry may also involve some examination of some merits issues. *See Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 209 (1991) (holding that where a court must determine the validity of an arbitration agreement, it "cannot avoid that duty" just because the court must decide an issue on the merits).  "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."  *Harry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).  The district court could not skip over the question of whether the MLA overrode the FAA simply because that issue may overlap with a merits question.

10 U.S.C. § 987(h)(1), (h)(2)(D). The Secretary's promulgated regulations define a residential mortgage as "any credit transaction secured by an interest in a dwelling, including a transaction to finance the purchase or initial construction of the dwelling, any refinance transaction, home equity loan or line of credit, or reverse mortgage." 32 C.F.R. § 232.3(f)(2)(i).

So the key question -- as the parties agree -- is whether the interest that the Steines purchased in the timeshare is an interest in a "dwelling." The regulations state that a dwelling is "a *residential structure* that contains one to four units, whether or not the structure is attached to real property. The term includes an individual condominium unit," among other things. *Id.* § 232.3(k) (emphasis added).

Neither the MLA nor its regulations define the word "residential." "Because there is no statutory or administrative definition of 'residen[tial],' we look to its ordinary, everyday meaning." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008) ("*Schwarz IV*"). Merriam-Webster Dictionary defines "residential" as an adjective meaning "used as a residence or by residents." *Residential*, Merriam-Webster, https://www.merriam-webster.com/dictionary/residential [https://perma.cc/WJ59-LDCP]. In turn, "residence" is a noun meaning "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn," or "a building used as a home." *Residence*, Merriam-Webster, https://www.merriam-webster.com/dictionary/residence [https://perma.cc/F7WP-A8KS]. A "resident" is

"one who resides in a place," *Resident*, Merriam-Webster, https://www.merriam-webster.com/dictionary/resident [https://perma.cc/8MXF-443N], and to "reside" is "to dwell permanently or continuously : occupy a place as one's legal domicile," *Reside*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reside [https://perma.cc/CPJ5-6NRU].

In other words, "as the administrative definition of 'dwelling . . .' suggests, the house, apartment, condominium, or co-op that you live in is a 'residence,' but the hotel you stay in while vacationing at Disney World is not." *Schwarz IV*, 544 F.3d at 1214. In *Schwarz IV*, we considered the meaning of the Fair Housing Act, which -- much like the MLA regulations -- defined a "dwelling unit" as a "single unit of residence." *Id.* (emphasis omitted) (quoting 24 C.F.R. § 100.201). Similarly relying on dictionary definitions of "residence," as well as Fair Housing Act case law, we observed that dwellings include houses, apartments, co-ops "that you live in," cabins occupied by migrant farm workers, and a children's group home where the average stay was nine or ten months. *Id.* at 1214 & n.8. By contrast, hotels, motels, the city jail, and bed and breakfasts are all not "dwellings." *Id.* We then wrote:

> [W]e think the differences between a home and a hotel suggest at least two relevant principles: (1) the more occupants treat a building like their home -- *e.g.*, cook their own meals, clean their own rooms and maintain the premises, do their own laundry, and spend free time together in common areas -- the more likely it is a "dwelling"; and (2) the longer the typical

occupant lives in a building, the more likely it is that
the building is a "dwelling."

*Id*. at 1214–15.

Although we are not bound by *Schwarz IV*, which inter-
preted a different statute, we find its reasoning persuasive.  With
these principles in mind, we hold that the timeshare interest pur-
chased by the Steines is not a residential mortgage.

In the first place, by definition, the Steines' timeshare inter-
est is not a dwelling within the meaning of the MLA because it is
neither a property interest in a "residential structure that contains
one to four units" nor "an individual condominium unit."  32 C.F.R.
§ 232.3(k).  Westgate says that the Steines have a property interest
in Unit 1-1912, which satisfies the latter definition of an "individual
condominium unit."  But Westgate fails to reconcile this assertion
with the language of the purchase and sale agreement itself.  Alt-
hough the deed "assigns" Unit 1-1912 to the Steines, the purchase
and sale agreement is clear that the property interest conveyed is
*not* in that specific unit, but "shall be limited to an undivided inter-
est *only* in the building in which the Assigned Unit and Assigned
Unit Week is located."

Moreover, the Plan, which the deed is subject to, is likewise
clear that the interest is an "undivided interest as a tenant in com-
mon with the other Owners in a particular building in the Resort
Facility," that is, the building in which the assigned unit is located.
So, Westgate's argument that the Steines have a property interest
in an individual condominium fails because it is clear that the

interest conveyed is an interest in the entire building in which the assigned unit is located. The fact that the Steines have an "assigned" unit does not change the nature of the conveyed interest. Because the interest cannot be in an individual condominium, then, it must be found in the former definition: a "residential structure that contains one to four units." *Id.* But the building in which the Steines have a timeshare interest is an eighteen-story tower with over 200 units. The plain language of the regulation precludes Westgate's argument that the timeshare interest is a residential mortgage. This alone is reason enough for us to resolve the matter.

However, even if the interest conveyed to the Steines was in the individual unit, and even if that unit could be fairly characterized as a condominium, Westgate still loses because the unit is not "residential" in nature. *See id.* (a dwelling is a "residential structure").

Start with the first *Schwarz IV* prong: how much occupants treat the place like home. The units at the Westgate resort are essentially hotel rooms. At the evidentiary hearing in district court, Westgate's chief business officer testified that Westgate has "hotel rooms at [their] properties" and that there are no "specific hotel rooms there," but that all the units are the same and are used interchangeably as hotel rooms or timeshare rentals. Indeed, the Westgate website itself describes the property as the "Westgate Palace Hotel," a "two-bedroom suite hotel" that is "the perfect destination for your next Orlando vacation." *Westgate Palace*,

https://www.westgateresorts.com/hotels/florida/orlando/west-gate-palace-resort (last visited Apr. 10, 2024). Furthermore, the Plan explicitly commands that the "Units shall be for transient resort occupancy only." Following their (hypothetical) week-long stay every other year, the Steines would return to their primary residence. Westgate also closed the property completely during the COVID-19 pandemic, following state orders to "suspend vacation rental operations."

Moreover, the restrictive covenants listed in the Plan severely limit the timeshare owner's control over the property. Westgate itself is exclusively in charge of maintenance, alterations, decor, and furnishings in every unit. The district court also found that Westgate operates the building "in a manner akin to any traditional hospitality operation, operating a network-wide reservations system and managing the resort properties (e.g. front desk, concierge, housekeeping, engineering, room service, *etc.*)."

On the other hand, it is true, as Westgate points out, that the Steines have mortgaged their interest and pay property taxes on their timeshare. These facts do weigh in favor of concluding that the units are residential in nature. But these facts taken together do not undermine the observation that, as the timeshare industry trade association -- on whose board two Westgate executives sit -- has previously told the government, "the consumer's primary purpose in purchasing a timeshare is to acquire a fully pre-paid, lifetime vacation experience rather than to purchase a dwelling or residence." Am. Resort Dev. Ass'n, Comment Letter on Proposed Rule

-- Integrated Mortgage Disclosures under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) 3 (Nov. 6, 2012), https://www.regulations.gov/comment/CFPB-2012-0028-2377.

Turning to the second *Schwarz IV* factor -- the length that the typical occupant lives in the building -- Westgate's chief business officer testified that, at any given time, only about thirty percent of the units were occupied by timeshare owners, and the remainder of the units operated as a hotel. He explained that an unspecified number of "snowbirds" would stay for multiple weeks at a time. The Steines have the right to stay only for one week every other year, and only then if a unit is available when they make a reservation, and Westgate sells time interest shares only in one-week intervals. In *Schwarz IV*, the Court determined that an average stay of six to ten weeks at a halfway house was an indicator that the halfway house was a residence, in contrast with the average length of stay at a hotel. 544 F.3d at 1215. This factor, too, weighs heavily against Westgate.

The long and short of it is that these timeshare interests are far more like a hotel and far less like a home. They are not residential in nature, and the mortgages that finance them are not "residential mortgages" within the meaning of the MLA exception.

## IV.

An order denying a motion to compel arbitration is not a final order. Thus, we may exercise jurisdiction over this interlocutory appeal only pursuant to § 16 of the FAA, which states that an

appeal may be taken from an order "denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(B).

However, as we have already explained, the MLA explicitly overrides § 2 of the FAA. Because § 2 "define[s] the field in which Congress was legislating," the remaining provisions of the FAA -- including § 16 -- "reach[] only those contracts covered" by § 2. *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 201–02 (1956). Therefore, where the MLA applies, § 16 of the FAA does not, and we lack any source of appellate jurisdiction. *See, e.g.*, *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017) ("Because the contract in this case is within the § 1 exemption, the FAA does not apply, and we consequently lack jurisdiction under 9 U.S.C. § 16(a)(1)(B) -- the only conceivable basis for our jurisdiction over this interlocutory appeal."), *aff'd*, 586 U.S. 105 (2019); *Int'l Bhd. of Teamsters Loc. Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012) (dismissing appeal for lack of appellate jurisdiction where district court correctly held that contract was excluded from the FAA by § 1).

The district court properly decided the question of whether the MLA overruled the FAA, properly determined that that the MLA *did* override the FAA, and correctly found that the MLA applied to the timeshare loan in this case. We dismiss this interlocutory appeal for lack of jurisdiction.

**DISMISSED.**